UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
RONALD ALSTON,

               Petitioner,                 **MEMORANDUM AND ORDER**

    -against-                          05-CV-593 (SLT)(MDG)

WILLIAM PHILLIPS,

               Respondent.
-------------------      ------------------------------------x
**TOWNES, United States District Judge:**

       Petitioner Ronald Alston brings this petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254, challenging his July 13, 2000, conviction on two counts of robbery in the first

degree and two counts of robbery in the second degree. Petitioner argues, *inter alia*, that the trial

court violated his constitutional rights by granting the prosecutor's reverse *Baton* motion and

denying petitioner's subsequent *Baton* motion and that both his trial counsel and appellate

counsel provided ineffective assistance of counsel. For the reasons stated below, petitioner's

application for a writ of habeas corpus is denied.

## *BACKGROUND*

       This case relates to three robberies of a Rite-Aid pharmacy located at 162-19 Hillside

Avenue in Jamaica, Queens (the "Rite-Aid" or "Pharmacy"), which occurred within a period of

just over two months. The first of these robberies took place early in the morning of March 15,

1997. There were only three people working in the store at the time: a cashier named Latrice, a

stock clerk named Leo, and the Pharmacy's co-manager, Mona Dutt. Dutt was in an office at the

rear of the Pharmacy, counting cash received by the Rite-Aid and making preparations to deposit

the money in the bank. Although the door to the office was closed, Ms. Dutt was able to see out

through a one-way window in the door.

At around 8:30 a.m., Ms. Dutt observed a short black man, in his thirties and wearing a black ski hat and black jacket, approaching the "Rite-Aid Express" area adjacent to the office (Dutt: 588). When Dutt came out of the office to ask if she could help him, the man initially asked her to explain how Rite-Aid's "money-gram" system worked. However, while Ms. Dutt was explaining the system, the man pulled a silver gun from a bag he had placed on the counter and ordered Dutt back into the office. There, he ordered her to fill his bag with the money she had been counting. After she complied, filling the bag with over two thousand dollars, the man left the store. According to Dutt, the whole incident lasted only five minutes.

The second robbery occurred around 6:00 or 6:30 in the morning of Friday, May 2, 1997, as Rite-Aid Assistant Manager Duewdett Chatram and two employees, Late Lawson and Jerome Scantlebury, were helping a truck driver unload the weekly deliveries from a semi-trailer in back of the Pharmacy. The driver was in the back of the truck, "sending ... stuff" to Mr. Chatram, who was stacking it onto "U-Boats," a type of large hand truck (625). Lawson and Scantlebury were inside the Pharmacy, unloading the supplies from the U-Boats (628).

Chatram was busy stacking supplies on the U-Boat when he was accosted by two armed black men, both of whom wore stockings over their heads and carried automatic pistols. The shorter of the men, who was approximately 5'6" or 5'7" tall and 150 pounds, called Mr. Chatram by his nickname, "Ricky," and demanded money (634-35). Before entering the store with Chatram, the men locked the driver in the back of the truck with Lawson and Scantlebury, who had returned to the truck with an empty U-Boat as the robbery was happening.

The taller of the perpetrators remained outside as Chatram led the shorter man to the office of the still-closed Pharmacy. There, the man ordered Chatram to "open up the safe" (638).

In fact, there were three safes in the office: one containing approximately one thousand dollars in rolled coins; one containing the drawers (or "tills") from the cash registers, each containing about $75.00; and one containing the previous day's cash receipts (Dutt: 578-80). The latter safe operated on "a fifteen-minute time delay" (Dutt: 580; Chatram: 641), meaning it would open fifteen minutes after the combination was entered.

Chatram told the man about the time delay, but claimed it was a half-hour, not fifteen minutes, in the hopes that the man would choose not to wait. However, the man replied, "[T]hat is okay, we have all the time in the world" (642), and remained in the office with Chatram until the safe opened. After approximately five minutes, the man rolled the stocking above his nose, revealing a mustache (642-43). The stocking remained in that position for the next three to five minutes, enabling Chatram to see the lower portion of the man's face and to observe sweat rolling down his cheeks. Thereafter, the man removed the stocking altogether, affording Chatram approximately five minutes in which to observe the man's face in the brightly lit office (644).

When the safe finally opened, the man instructed Chatram to empty clothes from a duffel bag that a fellow employee kept in the office and to place the rolled coins and the previous day's receipts in the bag. Chatram complied, placing a total of approximately four thousand dollars in the duffel bag. By that time, the taller perpetrator had joined the shorter man in the office. However, the taller man never removed the stocking and Chatram never had an opportunity to observe his face.

The men then took Chatram back to the truck, where they ordered him to climb in the back with the driver, Lawson and Scantlebury. They then latched the back door of the semi-

trailer, trapping the four men inside. The men remained in the back of the truck until approximately 8:00 a.m., when "the stock guy" arrived (648).

The third robbery occurred on the morning of Friday, May 16, 1997, exactly two weeks after the second robbery. Chatram was also working at the Pharmacy that morning, and arrived hours before the Pharmacy opened to unload the weekly deliveries from a semi-trailer, just as he had prior to the robbery on May 2. However, on May 16, Chatram and his co-workers took the precaution of locking the gate of the chain-link enclosure which surrounded the truck. That enclosure was topped with barbed wire, and no incidents occurred during the three hours the men spent unloading the truck.

Shortly after 8:00 a.m., Chatram opened the Pharmacy for business by unlocking the Pharmacy's front doors. He then went to retrieve the tills from one of the safes. Chatram was facing the front of the store as he prepared to open this safe, and observed a black man, approximately 5'5" to 5'6" tall, enter the Pharmacy. Although he looked familiar, Chatram did not immediately recognize him.

It took Chatram about one minute to open the safe and to remove the tills. He then stood up to find the familiar-looking man pointing a gun in his face. The man's face was uncovered, enabling Chatram to recognize him as the shorter of the two men who had robbed the store two weeks earlier.

The man told Chatram that he did not "want to hurt nobody," but "just want[ed] the money" (654). Meanwhile, Chatram could see a taller man – standing approximately six feet tall and weighing 200 pounds – directing the Pharmacy's security guard to kneel. Chatram "took a quick glance at [the] face" of the taller man (654) but, by the time of trial, could no longer recall

4

whether he had both a mustache and a beard or just a mustache (655-56). The men then took the $350 to $400 contained in the tills, along with some food stamps, transit tokens, and some blank Western Union money orders bearing the Rite-Aid logo. Three to five minutes after the incident began, the men walked out of the front door.

As soon as they walked outside, Chatram sent the security guard after them to see which way they were going. Chatram then called the police.

Shortly after the third robbery, a woman named Diane Dorsey called 911 to report that she had been the victim of a carjacking and kidnaping. A police officer from the 103rd Precinct, John Warner, interviewed Dorsey at her home, but became suspicious of her story when he learned that neither her car nor Rite-Aid money orders and food stamps contained therein had been stolen.

Although the Pharmacy was in the 107th Precinct, Warner was aware that the Pharmacy had been robbed that morning (428). Warner deduced that the money orders might be proceeds of the robbery, and took the money orders to the Pharmacy to be fingerprinted. Although no prints could be lifted from the money orders, Warner nonetheless decided to make a computerized check of Dorsey's criminal history and to interview her further. During that second interview, Warner told Dorsey that he knew she was on parole and falsely alleged that he had a videotape of the intersection at which the carjacking had allegedly occurred. Dorsey then "changed her story" (432). As discussed below, *see* pp. 16, *ante*, the record does not reflect what Dorsey told Warner thereafter. However, it is clear that by the early morning of May 17, 1997, Dorsey, petitioner and a man named Glen Milton had all been arrested in connection with the May 16, 1997, robbery.

5

On Saturday, May 17, 1997, the police brought Chatram and other Rite-Aid employees to the 103rd Precinct to view two lineups. In the first of the lineups, Chatram identified petitioner as the shorter of the perpetrators. In the second lineup, Chatram identified Glen Milton as the taller man in the May 16, 1997, robbery. Chatram, who had never seen the face of the taller of the perpetrators of the May 2, 1997, robbery was unable to identify Milton in connection with that robbery. Petitioner was also identified in connection with the first robbery by Dutt, who told the police that petitioner "look[ed] like" the person who had robbed the Pharmacy on March 15, 1997 (599).

Petitioner, Milton and Dorsey – a woman who lived with petitioner at the time of his arrest – were subsequently indicted in connection with the robberies. Four counts in this indictment charged all three defendants with two counts of both robbery in the first degree and robbery in the second degree: one count of each offense relating to the May 2 robbery and the second count of each offense relating to the May 16 incident. A fifth count charged petitioner alone with robbery in the first degree in connection with the March 15, 1997, robbery. The cases against petitioner and his co-defendants were subsequently severed and, in February 2000, petitioner went to trial on these charges in the Supreme Court of the State of New York, Queens County, before Justice Roger Rosengarten.

***The Trial***

### ***The Sandoval Hearing***

Trial began on Tuesday, February 8, 2000. Prior to jury selection, the Court conducted a *Sandoval* hearing to determine what information concerning petitioner's criminal history could be used on cross-examination if petitioner chose to take the stand. In the course of reviewing

6

petitioner's rap sheet, defense counsel noted that petitioner had given the name, "Jeffrey Milton," in connection with a pending criminal case and requested that the prosecution be precluded from cross examining petitioner regarding his use of this alias. Specifically, defense counsel argued:

> It's a pending matter and it's the only time since his name is not on the indictment that the name Milton would match someone else whose name will come up in the testimony of this trial as having been arrested and having played a particular role and I feel it's merely straight prejudice with no facts that could back it up .... (11).

When the prosecutor noted that petitioner had used the same alias in connection with another arrest, defense counsel noted that that case, too, had "no criminal resolution" (11). Despite defense counsel's efforts, the trial court ultimately ruled:

> The Court will allow the district attorney to question the defendant, should he take the stand, as to any other names he may have used without referring to any arrests or convictions .... (16).

### Jury Selection

Immediately after the Sandoval hearing, the trial court commenced a lengthy jury selection process. That process not only consumed the rest of the day, but consumed most or all of the next two days, during which the court conducted four separate rounds of voir dire. During the first half of each round, Justice Rosengarten addressed each of the venirepersons individually, posing the same litany of questions to each prospective juror. One of these questions related to the venireperson's education, and was usually phrased, "how far did you go in school." During the second half, both the prosecutor and defense counsel were afforded an opportunity to question the prospective jurors themselves. Notably, only the first half of each round was recorded.

7

Jury selection proceeded uneventfully during the first three rounds. In the first round, the parties consented to excusing seven of the 16 venirepersons questioned; defense counsel exercised four of his 15 available peremptory challenges; and the prosecution exercised two peremptory challenges. Three jurors were empaneled, including Richard Mays, a disabled veteran with a high school education.

During the second round, three of the 16 venirepersons questioned were excused on consent, and another two were excused for cause. Defense counsel exercised another five peremptory challenges, and the prosecution exercised another two. Four more jurors were empaneled, including a woman, alternatively referred to as Julie Myint (109) and Ms. Mien (154), who had only a high school education.

Only 14 venirepersons were placed in the jury box at the start of the third round of voir dire, but one was immediately excused for reasons not stated in the record (206). Of the remaining 13 venirepersons, three were excused on consent. Defense counsel and the prosecutor exercised three peremptory challenges apiece, and the remaining four venirepersons were empaneled. The four included Charlie Jones, a retired janitor who had only an eleventh-grade education, and Ludmilla Domenici, a maintenance worker who was never questioned about her education.

During the fourth round of voir dire – which began on Thursday, February 10, 2000, and concluded on Monday, February 14, 2000, following a three-day weekend – Justice Rosengarten and the attorneys questioned another 14 venirepersons, including a Caucasian woman, Charlotte Berge, and an Afircan-American woman, Nyla Williams. In response to questioning by the judge, Ms. Berge, who was the second person questioned during the round, stated that she was

not employed and lived with her 52-year-old daughter and son-in-law in Ozone Park, Queens (313-15). When asked about her past employment, Ms. Berge stated that, "[m]any years" before, she had worked as an "information operator" and in "local dimes stores" (314). She had also raised three children, including a second daughter, who worked for an unspecified firm on Long Island, and a son, who worked in a Brooklyn public school (314-15). However, Ms. Berge herself was not well-educated. When asked how far she had gone in school, Ms. Berge replied, "[J]ust junior high" (314).

Ms. Berge also told Justice Rosengarten that she "had an ex-son-in-law that [*sic*] was a police officer for 20 years" (316). Asked if this fact would "make ... [her] more favorable to the police or the D.A.," Ms. Berge responded, "Not really" (316). She agreed that police officers are "like everybody else," and stated that she could "use [her] experience in life and common sense to determine whether somebody is telling ... the truth" (317). When Justice Rosengarten inquired as to whether she could be "fair and impartial and give both sides a fair trial," Ms. Berge answered with an unequivocal, "Of course" (317).

Ms. Williams, who was the fourth venireperson questioned by Justice Rosengarten during the fourth round, was a single woman who had lived in Jamaica for twenty years, but not close to the Rite-Aid (319-20). Her responses to Justice Rosengarten's questions were succinct but responsive, rarely exceeding a single word in length. For example, when asked how far she went in school, Ms. Williams responded simply, "Bachelor's" (320). She was only slightly more effusive when asked about her job ("[f]raud investigator for the city"), how long she had worked in that capacity ("[t]hree years"), her membership in organizations ("[j]ust the union of my job"), and what she liked to do in her spare time ("[s]pend it with my family and friends") (320-21).

9

However, she unequivocally stated that she understood the principles of law that Justice Rosengarten had discussed with the jury, could follow them, and could be fair and impartial to both sides (321).

After the attorneys questioned the venire, the attorneys agreed to seat the first venireperson questioned during the fourth round as juror number 12. However, when defense counsel attempted to exercise a peremptory challenge against Ms. Berge, the prosecutor made a reverse *Batson* application, arguing that defense counsel had "gotten rid of every white person he's had the opportunity to" (355). Before the prosecutor could say any more, defense counsel asked for, and was granted, permission to address the court (355). Although the prosecutor was not afforded the opportunity until later to point out that defense counsel had exercised 11 of his peremptory challenges against Caucasians, the trial judge appeared well aware of this fact. When defense counsel began his comments by stating, "Mr. Alston has kept a list of the dismissals," the judge interrupted to say, "So have I" (355).

Defense counsel did not deny that the majority of his peremptory challenges had been exercised against Caucasians, saying, "Yes, I have kicked off white jurors. I have also kicked off a black juror, an Asian juror" (356). However, defense counsel argued that the percentage of Caucasians he had challenged was proportionate to the percentage of Caucasians in the venire. He stated:

> [T]he jury panel from which we were to select jurors I feel is overwhelming white. Approximately 10 to one. My challenges, if you add them that way, I believe including Miss Berge, would be eight to two. I don't think that raises [*sic*] to the level of reverse Batson (356).

This argument understated the number of peremptory challenges that defense counsel had used to that point. In fact, defense counsel was attempting to use his thirteenth peremptory

10

challenge against Ms. Berge and, by all accounts, had exercised only two of those challenges against non-Caucasians. Moreover, while the exact racial composition of the venire remains unclear, it appears that, of the 31 venirepersons who could have been peremptorily challenged prior to Ms. Berge, at least 8 were not Caucasian.[1] Therefore, defense counsel's assertion that the ratio of Caucasians to non-Caucasians was "[a]pproximately ten to one" was a gross exaggeration.

Without asking the prosecution to elaborate on the prima facie showing of discrimination, the trial court asked defense counsel if he had "a reason other than race" for his peremptory challenge of Ms. Berge (357). Defense counsel responded, "Her statements that, I guess so. I would try. Her limited education" (357). Defense counsel then attempted to return to his statistical analysis, suggesting that the selection of alternate jurors should be considered a separate proceeding and that his challenge of Ms. Berge was, therefore, his first challenge (357).

Thereafter, the trial court afforded the prosecutor an opportunity to be heard. The prosecutor did not refer to defense counsel's race-neutral explanations, but placed on the record the ethnicity of 7 of the 9 venirepersons whom defense counsel had challenged during the first two rounds (358). The prosecutor then described the racial composition of the jurors who had been selected to that point and concluded, "[D]efense has been removing white people for no reason other than the fact they are white" (358).

---

[1] A total of 46 venirepersons were questioned during the first three rounds, but 16 of these were excused for cause or on consent. The prosecution represented, without contradiction, that by the time Ms. Berge was challenged, the parties had agreed to seat six non-Caucasian jurors: "three black individuals and also one black Hispanic, one Asian, and one Indian" (358). Defense counsel himself represented that he had exercised peremptory challenges against two other non-Caucasians: "a black juror [and] an Asian juror" (356).

The trial court agreed, telling the prosecutor, "I believe you are correct" (358). Justice Rosengarten then addressed, and rejected, defense counsel's argument that the selection of alternate jurors should be considered a separate proceeding, before stating that he was "going to seat Miss Berge" (358).

Both parties consented to excuse the third venireperson questioned during the third round. However, when the prosecutor attempted to exercise a peremptory challenge against the fourth venireperson – Ms. Williams – defense counsel raised a *Batson* challenge (359). When asked to state the "grounds" for his challenge, defense counsel stated:

> The district attorney has summarily dismissed ... four female jurors
> out of eight. Of the four female jurors, two are black and two are
> Hispanic. All the jurors challenged by the district attorney are
> either black or Hispanic or Asian (360).

When Justice Rosengarten interrupted to say, "I believe there was one challenge of a white male" (360), defense counsel continued:

> Judge, as I said, I'm working off the list compiled by my client. I
> have eight people named. I don't have a single white person ....
> (360).

After reviewing his own records, Justice Rosengarten concluded that defense counsel was correct, saying "I note the D.A. has excluded two Asians, three Hispanics, and this would be the fourth black, three being female" (361).[2] He then asked the prosecutor to provide "an articulable reason for excusing Miss Williams" (361-62). The prosecutor responded:

> Miss Williams works for the city as a fraud investigator. When I
> was speaking to her I really did anticipate more of a what I would

---

[2] Justice Rosengarten may have overstated the number of peremptory challenges that the prosecution had exercised. According to the record, Ms. Williams was the eighth, not the ninth.

12

call police edge or some type of attitude. She, for the first half on
Thursday, was basically asleep in her chair. She wouldn't look at
me after I spoke to her some more. And she had – it was basically
her demeanor when she was speaking to me (362).

Immediately thereafter. Justice Rosengarten denied the *Batson* motion and "sustain[ed] the ...

peremptory challenge" to Ms. Williams, saying:

I find she was somewhat evasive. All right. I feel she would not
be open and fair with everybody, so I'm going to sustain that
challenge (362).

### *The Opening Statements*

In his opening statement, the prosecutor began by reading the indictment, highlighting the

fact that Glen Milton and Diane Dorsey were also involved in the crimes and urging the jurors to

"keep these names in mind" (379). The prosecutor then immediately focused the jurors'

attention on the circumstances that resulted in the petitioner's arrest, suggesting that petitioner

had been inculpated by Dorsey after her carjacking story unraveled. Although Scantlebury was

not on either party's witness list (42), the prosecutor implied that there would be evidence that he

observed petitioner and Milton enter Dorsey's red Honda automobile immediately after the May

16, 1997, robbery. The prosecutor stated:

[O]n May 16th of 1997, as they [petitioner and Milton] were
running out of the store the security guard was sent out by the
manager of the store saying. which way did they go. And you will
learn that they came running out of the store. The employees ...
went running out of the store. He [Petitioner] and Milton were
getting into a red Honda, which was racing down the block (384-
85).

After noting that the Honda was registered to Dorsey, whom he characterized as petitioner's

"girlfriend" (385), the prosecutor asserted that petitioner, Milton and Dorsey had collectively

"concocted" the carjacking story because they were afraid the employees had observed the license plate number of the Honda (385).

Unaware of precisely what the prosecutor's evidence would show, defense counsel made no contemporaneous objections to these portions of the opening statement. However, before giving his own opening statement, defense counsel stated:

> I believe [the prosecutor] is attempting to introduce [Ms. Dorsey's] testimony. On his openings he has already made Miss Dorsey and Mr. Milton part of this trial, which was severed for reasons best known to this Court.[3] They should not be tried together (402).

Defense counsel then attempted to preclude the introduction of Dorsey's 911 call to the police, principally arguing that he had not been provided with a copy of the 911 recording prior to trial. The Court rejected defense counsel's application, holding that the tape had been played at Milton's trial and that defense counsel was "privy to what happened [there]" (404).

In his opening statement, defense counsel hinted to the jury that the prosecutor would be unable to present evidence to substantiate certain portions of his opening statement. Noting that the prosecutor had mentioned "a security guard name[d] Mr. Scantelbury [sic]" (409), defense counsel stated:

> The theory, or part of the theory I feel of the People's case, is that Mr. Scantelbury [sic] is supposed to have observed more than the robbery. He is supposed to have observed the get-away car on one occasion. He would possibly have given the police information about it.
>
> Ask yourself where that information is as this trial proceeds. Because I don't believe you're going to hear any of it (409).

---

[3]While this Court suspects that *Bruton* concerns motivated the trial court's decision to sever the trial, the precise reason is not set forth in the record presented to this Court.

Defense counsel then addressed the prosecutor's repeated references to Dorsey as follows:

> As to Miss Dorsey, I honestly don't know what is going to happen with her. But since her name has been brought up I feel obligated to speak to you about her.
>
> Miss Dorsey, you will hear, is a liar. She is a liar who lies when she says – she is lying. She lies when she said – she lied about her lie, about her first lie. She lies when she lied that. She lied about the lie she lied about (409-10).

### *The People's Case*

The prosecutor began his case by calling the policemen who had been involved in petitioner's arrest: Detectives John Warner and Lawrence Higgins, and Sergeant Kenneth Kearns. Through Warner, the prosecutor established that Warner had been a police officer in the 103rd Precinct on May 16, 1997, and had been assigned to investigate Dorsey's allegations that she had been carjacked and kidnaped (415). When the prosecutor then sought to introduce a recording of Dorsey's 911 call, defense counsel requested a voir dire, then objected to the recording on "chain of custody" grounds (418). An unrecorded sidebar conference ensued, after which the prosecutor was permitted to admit the recording subject to connection (418). After the prosecutor established that Warner could recognize the voice on the recording as Dorsey's, the prosecutor was permitted to play the recording for the jury (418-19).

After the recording was played, Warner testified that he had spoken to Dorsey on the morning of May 16, 1997, in front of 110-38 Merrick Boulevard – the building in which she resided in apartment 2R (420). Warner stated that her car – a red 1993 Honda – was in front of that building when Dorsey told him about the carjacking (420). When asked by the prosecutor,

"What did you think about her initial story?", Warner testified that he "didn't like it, but ... had to

investigate it" (429). Then, asked to "explain ... what was going through [his] mind at that point"

(429), Warner stated:

> The whole concept of being carjacked without being carjacked. It
> just didn't make a lot of sense. Three guys jump into a car at
> gunpoint to steal a chain. I guess it happens, but it's the first time I
> think I ever investigated it (429-30).

As mentioned above, *see* pp. 5, *ante*, Warner eventually convinced Dorsey to "change[]

her story" by falsely telling her that the police had a videotape of the intersection at which the

incident allegedly occurred (432). Although Warner did not testify as to what Dorsey told him,

he implied that she had inculpated Milton. First, Warner testified on direct examination that he

had a "further conversation" with Dorsey after she changed her story and that, "[a]fter this

conversation," he "proceeded to an address in the 113[th Precinct] where [he] arrested a Glen

Milton" (432). Later, Warner testified that he "brought [Dorsey] to the 113[th Precinct] ...[,]

showed her more photos, and ... brought her back home again" before he "went to Mr. Milton's

house" to arrest him (435).

The testimony concerning what prompted the arrest of petitioner was not as clear. After

testifying about Milton's arrest, Warner was permitted to testify, over defense counsel's

objection, that he had had a "conversation" with Glen Milton (434). The prosecutor then asked,

"Did there come a time after the conversation with Glen Milton that you went anywhere?" (434).

Warner responded in the affirmative (434), but did not immediately state where he had gone.

The prosecutor then asked Warner what time of day he arrested Milton, adducing testimony that

Milton had been arrested around 8:00 in the evening on May 16, 1997, and that the conversation

with Milton lasted until "10:00, 10:30 at night" (434-35). After that, the prosecutor asked three more questions to establish the time frame of Warner's conversations with Dorsey (435).

By the time the prosecutor specifically asked Warner where he had gone after the conversation with Milton, so much time had elapsed that the prosecutor felt the need to remind Warner of his earlier testimony. The prosecutor asked:

> Now, after the conversation you had with Glen Milton, you just told us you went somewhere else. Where did you go?

Warner testified that he had "returned to 110-38 Merrick Boulevard," but that it was "about midnight" when he arrived there (436). After asking three more questions concerning Milton's physical features, the prosecutor again reminded Warner, "We talked about midnight you went back to Miss Dorsey; is that correct?" (436). The prosecutor then confirmed that the address was 110-38 Merrick Boulevard (436), and asked several questions to establish that Warner had gone there in the company of his immediate supervisor, Sergeant Kearns, and two other detectives: Larry Higgins and a detective who had since retired to North Carolina (436-37). Finally, the following colloquy took place:

> Q:   Why were you going back to Diane Dorsey again?
>
> A:   To arrest Mr. Alston.
>
> Q:   What time did you get to her house?
>
> A:   Between 12:00 and 12:30, somewhere right around there (437).

Warner's testimony was contradicted on this point by the testimony of his supervisor, Sergeant Kearns, and by that of Detective Higgins. According to Kearns, the police went to 110-38 Merrick Boulevard to arrest Dorsey (549). However, Kearns testified that he was "aware that

[he] might be looking for a second suspect, as well" – namely, petitioner (549). Higgins testified that he had been told that they were going to 110-38 Merrick Boulevard that night to arrest both Dorsey and petitioner (Higgins: 542).

Warner, Kearns and Higgins all testified concerning the circumstances of petitioner's arrest. Warner and Kearns went inside the building – located on Merrick Boulevard between 110th and 111th Avenues (Higgins: 534) – where Warner knocked on the door of Apartment 2-R (Warner: 438). In the meantime, Higgins and the other detective stood on 110th Avenue, from which they could see the rear of 110-38 Merrick Boulevard (Higgins: 531).

After Warner knocked, Dorsey stalled for some time before opening the door to the apartment (Warner: 438-39; Kearns: 550). When Dorsey finally let the detectives in, they told her that they were looking for petitioner (Warner: 439; Kearns: 550). Immediately thereafter, they heard the sound of a window being opened in the back bedroom (Warner: 438 39; Kearns: 550).

Higgins testified that, a few minutes after Warner and Kearns entered the building, he observed a black man step out of a window on the second floor of 110-38 Merrick Boulevard and onto the roof of the store that occupied the first floor of that building (Higgins: 531). Walking along the roof, the man then entered a second-floor window of 110-40 Merrick Boulevard, which Higgins described as "an abandoned crack house" (Higgins: 533). Higgins immediately radioed Kearns and Warner concerning his observations (Higgins: 533)

Kearns received a radio transmission from the detectives outside just after he heard the window opening (Warner: 439; Kearns: 550). He and Warner entered the bedroom to find the window wide open (Warner: 439; Kearns: 551). Kearns then stepped out of the window

18

(Warner: 439), along the roof, and into the window of the adjacent building (Kearns: 55-52). Although Warner remained with Dorsey (Warner: 440), Kearns then searched the abandoned building by flashlight for some unspecified period before he came across petitioner, "laying [*sic*] on the floor under a bunch of dirty clothes" and "pretending to be asleep" (Kearns: 553).

On cross-examination, defense counsel established that Kearns could not tell how long petitioner had been in the abandoned house (Kearns: 557). Indeed, when asked if petitioner "could have been there for an hour," Kearns answered, "I suppose so, yes" (557). In addition, defense counsel established that there were other people in the building at the time, including two disheveled Hispanic men who emerged from an adjoining room as the police were handcuffing petitioner (Kearns: 558-59). However, Kearns, who testified on direct examination that he had met petitioner before that date and "knew what he looked like" (549), did not even frisk these men (560). When asked on cross-examination where Kearns had seen petitioner before, Kearns stated, "A few years prior my Anti-Crime Unit arrested Ronald Alston" (557).

In cross-examining Warner, defense counsel intentionally adduced evidence concerning what Dorsey had told him about the Rite-Aid robbery. For example, defense counsel asked, "[W]hen you went back to [her] residence with the intention of placing her under arrest ...[,] [h]ad you spoken to her about either Mr. Alston or Mr. Milton" (470). When Warner replied that he had spoken to her about Mr. Milton, defense counsel asked not only, "Did you ask her if she had any photographs of Mr. Milton?" but also whether he asked her if she had any photographs of petitioner (470-71).

After attempting to imply that Dorsey had inculpated petitioner, defense counsel attempted to discredit Dorsey. First, he asked Warner to recount all the times in which Dorsey

19

had lied to him (Warner: 464). Warner not only recounted several specific instances, but readily

admitted that "[s]he lied to [him] a lot" (465). Defense counsel then established through Warner

that falsely reporting a crime to police officers was a crime (465). Defense counsel contrasted

petitioner's credibility with that of Dorsey, adducing testimony that petitioner's answers to his

pedigree questions were independently verifiable and that petitioner had immediately denied

participating in any robbery (461-63). Defense counsel also adduced proof that while Warner

was aware that Milton's fingerprint had been recovered from the red Honda, he was not aware

that petitioner's fingerprints had been found on the car (474-75).

Defense counsel also established that Warner had not interviewed eyewitnesses to any of

the robberies in any great detail. Warner recalled speaking to Dutt about the March 15, 1997,

robbery prior to the lineups, but admitted "it was just a quick run-through" (491). Similarly,

Warner admitted that he spoke to Scantlebury only "[b]riefly" (493), and had not spoken to

Chatram at all (493). Defense counsel then engaged in the following line of questioning:

> Q: As to the incident of May ... 2nd, how many people are
> supposed to have committed that particular robbery.
>
> A: I believe in that incident there were two perpetrators.
>
> Q: Were you aware of that on May 17th, [19]97 when you
> filled out a complaint for the D.A.'s office?
>
> A: Yes.
>
> Q: Did you arrest Mr. Jeffrey Milton for that particular
> robbery? (494).

The prosecutor then objected, asking "Did he arrest who?" (494). The court did not rule, but

rephrased the questions, saying, "Calls for a yes or no. Did you arrest one by the name of Jeffrey

Milton for a robbery?" (494). When Warner answered that he had not, defense counsel continued the examination as follows:

> Q:    Did you arrest anyone other than Mr. Alston?
>
> A:    I arrested Mr. Alston for that.
>
> Q:    Is the second perpetrator still at large?
>
> A:    Yeah, I believe so (494).

The prosecution then called Mona Dutt, Duedwett Chatram, Shalini Shivsankar and Late Lawson to testify about the robberies and their identifications of petitioner. The first of the eyewitnesses, Mona Dutt, unequivocally identified petitioner in court, telling the jury that she was "sure" he was the perpetrator of the March 15, 1997, robbery (600). While Dutt testified that she had also identified petitioner at the lineup, she admitted that she had been only "95 percent sure" at the time (600).

During the course of direct examination, the prosecutor established that Dutt was four to five months pregnant and that the perpetrator had pointed his gun at her abdomen (594). However, because of the way in which the prosecutor adduced this testimony, it was not immediately apparent what point he was trying to make. The prosecutor first asked, "[when he put the bag down and took the gun out, did he ever point the gun at anything?" (594). When Ms. Dutt replied that the perpetrator pointed the gun at her "belly" (594), the prosecutor asked:

> Q:    And what was your physical condition like on May [sic] fifteen of 1997?
>
> A:    I was four to five months pregnant (594).

Defense counsel did not make any objections during this line of questioning.

Ms. Dutt testified that there were only three other employees in the store at the time of the first robbery: a cashier named Latrice and a stock clerk named Leo. Leo was working in the "back room," from which he could not have seen the incident (Dutt: 596). However, Dutt testified that Latrice, who was working behind the cash register at the front of the store, asked the perpetrator if she could help him as soon as he entered the store, and that he "totally ignored her" (Dutt: 588). Dutt further testified that, as he was leaving the Pharmacy, the perpetrator told Latrice that she "could call the cops now" (Dutt: 595).

When cross-examined by defense counsel, Dutt initially claimed that the perpetrator had, in fact, spoken to Latrice when he first entered the store (Dutt: 612). However, defense counsel subsequently established that Dutt, herself, had not heard a conversation between Latrice and the perpetrator (Dutt: 613). Rather, Dutt's testimony concerning Latrice's interaction with the robber was entirely hearsay, based on what Latrice told Dutt sometime after the incident (Dutt: 612-13).

Defense counsel also exposed serious flaws in Dutt's recollection of the lineup. First, Dutt testified on cross-examination that, prior to the lineup, the police told Ms. Dutt that she was "going to view a lineup with regard to a robbery that took place on May 16th" (601). On re-direct examination, the prosecutor was able to establish that Dutt did not witness the May 16th robbery and "looked at the lineup based upon what she saw in March" (602). However, on re-cross examination, Dutt again became confused about the date of the robbery she had witnessed, repeatedly testifying that the robbery "probably" occurred "March 16th" (602, 604), and that she had stated at the lineup that she "recognized someone from March 16th" (603, 604).

Dutt then became confused as to how many police officers had been with her when she made her lineup identification. First, she told defense counsel that there were none (607). Later

in the re-cross examination, she implied that there was at least one, but could not recall how many police officers were present or whether any of them recorded her answers to their questions (608). On re-re-direct examination, she again repeatedly testified that there were no officers present, even when questioned by the trial court and even after the prosecutor asked, "Are you sure?" (615-16). Thereafter, Ms. Dutt acknowledged that "[t]he cops" had asked her what number she recognized, but continued to be uncertain where that conversation had taken place, saying:

> I think when I went outside they asked me if I recognized
> somebody. I'm not really sure exactly if they were in the room
> with me or out [sic], but I know somebody asked me if I
> recognized somebody (616).

After Dutt was excused, the prosecution called Chatram to testify about the two May robberies. However, Chatram could no longer recall what the shorter perpetrator looked like (649), and was unable to identify petitioner in court. He did, however, testify concerning the lineup procedure and his identification of petitioner at the lineup.

On cross-examination, defense counsel attempted to give the jurors reasons to doubt the accuracy of Chatram's identification. First, defense counsel established that Chatram had only limited recollections of the stockings the perpetrators wore over their heads. Asked if the stocking was sheer or black, Chatram stated:

> I think it was a brown stocking. I'm not sure. I can't remember. I
> don't recall the color of the stocking (674).

Defense counsel then pressed Chatram further, seeking to establish that the stocking was not sheer or "see-through" and would distort the color of the perpetrator's features. However, Chatram responded that he did not "know the difference about stockings," and knew only that "it was a stocking" (674).

Defense counsel then attempted to cross-examine Chatram about details of his account of the May 2, 1997, robbery which may have been omitted from the police report. First, defense counsel asked if Chatram had told the police that the shorter perpetrator had a mustache (710-11). Chatram replied that he could not remember if he mentioned the mustache, but thought he had (711). Defense counsel then asked, "If the police report indicates your description did not contain a mustache, would that be more accurate than what you're saying today?" (711). The prosecutor objected, but not until after Chatram answered in the affirmative, and the objection was overruled (711). The trial court also initially overruled the prosecutor's objection to defense counsel's next question: "Did you ever, when talking about the May 2nd robbery, tell any of the police investigating the case that the shorter man took the mask off?" (711). However, before Chatram could answer, the prosecutor renewed the objection on the ground that defense counsel was "[i]mpeaching from the negative" (711). The court sustained the objection on this ground.

Defense counsel then rephrased the question, asking if Chatram ever told the police "about the mask." (711). Chatram replied that he had told the police "everything that happened" (712). Defense counsel then asked, "Except maybe the mustache?", prompting the prosecutor to object. After that objection was sustained, defense counsel asked, "If you made a mistake about the mustache, is it possible that you made a mistake about other things?" (712). When the prosecutor objected yet again, the trial court not only sustained the objection but instructed the jury to disregard the testimony regarding the mustache (712).

The prosecutor then called Shalini Shivsankar, who worked as a cashier at the Pharmacy on May 16, 1997. Although Chatram made no mention of her, Shivsankar claimed that she was in the office at the time of the robbery (735). She further claimed that, looking through the one-

way glass in the door, she was able to see one man leading the security guard to the back of the store at gunpoint and to see another man forcing Chatram to open the safe (735-36).

Shivsankar was among the Rite-Aid employees to view the lineups on May 17, 1997. When she viewed the first lineup, she picked petitioner but told the police that she was "not sure" (739-40). In the second lineup, she identified Milton without equivocation (741).

Defense counsel's cross examination of Shivsankar was very brief. First, defense counsel established that Shivsankar was sure about her identification of Milton. Defense counsel then asked, "When you said you weren't sure about number 5, you weren't sure?" (742). When Shivsankar answered that question in the affirmative, defense counsel ended his cross examination.

The prosecution's final witness was Late Lawson, who had been working in the Pharmacy at the time of both the May 1997 robberies. Lawson testified that, on May 2, 1997, he was bringing a U-boat through the stockroom en route to the truck when an armed man emerged from "under the truck with a gun" (750). The man was wearing a stocking over his face, preventing Lawson from seeing his face clearly (751). However, Lawson was able to tell that he was a black man, and was approximately six-feet tall (751).

The man ordered Lawson into the back of the truck, where Lawson observed the driver and Scantlebury lying face-up on the floor with their hands in the air (753). The man directed Lawson to assume that same position and he complied (753). A few minutes later, Chatram and another man entered the stockroom. Lawson was able to see this other man for only "a second" (756) – enough time to see that he, too, was a black man and "a little shorter" than the first man, but not enough time to permit Lawson to identify him (755-56).

After a short conversation with the shorter man, the gunman left the truck and locked the truck's door behind him (757). Lawson, Scantlebury and the truck driver then sat in the truck for 15 or 20 minutes before the men returned (758). As soon as the trio saw the men open the truck door, they lay on their backs again (759). Although Lawson was able to see the face of the shorter man for "a few seconds," he was never able to "get a good look" at him (759-60). The taller man still had "the mask on," so Lawson was never able to see his face clearly (759). The men then locked Chatram in the truck and left.

On May 16, 1997, Lawson happened upon the robbery in progress. Lawson testified that he exited the stockroom to see Scantlebury and a black man, approximately six feet tall, standing behind him. Lawson also saw Chatram opening the safe in the "Rite Express" area of the store, and another, shorter man pointing something at Chatram from behind (764-65). Aware that it was a robbery, Lawson "just kept going" into the pharmacy area of the store, where he called 911 (767). Before Lawson could report the robbery, however, he saw the taller perpetrator looking in his direction (768). Lawson hung up the telephone, but continued to look in the direction of the robbery and was able to observe the "whole face" of the shorter perpetrator as the men left the Pharmacy (768).

At the lineups the next day, Lawson identified petitioner and Milton as the perpetrators of the May 16, 1997, robbery (772-73). Lawson told the police that he was "sure" about his identification of petitioner, but only "pretty sure" about his identification of Milton as the taller of the perpetrators (774). At trial, Lawson could only say that petitioner looked like the shorter of the perpetrators, but that he could not "really tell" (775).

***The Subsequent Trial Proceedings***

Lawson's testimony concluded on Wednesday, February 16, 2000, and the trial was adjourned until the following Tuesday (815-16). However, on Friday, February 18, 2000, one of the African-American jurors, Lloyd Bellamy, was arrested on charges of grand larceny in the third degree, a class D felony (826). Bellamy informed the court that he would be unable to appear, and the court adjourned trial for the day on Tuesday, February 22, 2000. Although Bellamy was placed on bail (827), he called the court again on Wednesday morning to state that he would unable to serve because he had a court date of his own (825).

When the trial court suggested excusing Bellamy and replacing him with Berge, defense counsel protested that the court would be "removing a black juror to be replaced with a white juror" (827). Defense counsel further noted that the Caucasian juror was the very person who had been "seated over [his] objection based upon a reverse Batson challenge by the district attorney" (827). Defense counsel asked for a mistrial, and called upon the prosecutor to "mitigate whatever damage there might be by substituting alternate number 2, who is also black" (829). However, the prosecutor was unwilling to do so and the trial court substituted Berge for Bellamy, giving defense counsel an exception for the record (829-30). The motion for a mistrial was denied (830).

After both sides rested on the record, the jury heard summations. Defense counsel began by pointing out that petitioner was not arguing that the robberies did not take place, but only that he did not commit them (841). Defense counsel himself characterized the fact that one of the perpetrators had pointed a gun at the belly of the pregnant Mona Dutt as "disgusting," but reminded the jury of Dutt's equivocal identification of petitioner (841). After chronicling various problems with her testimony, he stated:

> [Y]es, it's disgusting what was done to her by somebody. The problem is you cannot convict the wrong person just because something bad happened to a human being (842).

Defense counsel then questioned Chatram's credibility by pointing out various inconsistencies in his testimony. In particular, defense counsel noted contradictions between Chatram's claim that one of the perpetrators of the May 2, 1997, robbery had uncovered his face because he was "so damn nervous that the sweat is pouring down," and his recollection that the same perpetrator stated that he had "all the time in the world" (851). Defense counsel also questioned whether the perpetrators in the two May robberies were the same, noting that Chatram – despite his excellent opportunity to observe the shorter perpetrator in the May 2 robbery – did not immediately recognize the shorter perpetrator in the third robbery as the same man.

Defense counsel then asserted that the person on whom the police had relied in arresting petitioner was Diane Dorsey (852). Defense counsel reminded the jury of Warner's testimony about how many times Dorsey had lied to him, and argued, "She lied about lying about lying about a lie" (852-53). However, defense counsel noted that her car contained no evidence linking petitioner to the crime, stating that the only fingerprint lifted from the car belonged to someone else (853).

Defense counsel also noted that the prosecution had not called Dorsey or Scantlebury. With respect to the former, defense counsel was brief, asking rhetorically, "Ask yourself where she is" (852). However, with respect to the latter, defense counsel argued at length, saying:

> Ask yourself where Mr. Scantlebury is? A security guard present for three robberies, who isn't a witness. A person trained to observe, not trained like the police. Nobody is saying that, but trained to observe. A person whose life is on the line because he's got a uniform on and no gun to back up the uniform. ... Where is that witnesses [sic], ladies and gentlemen? (860).

On his summation, the prosecutor promptly responded to defense counsel's arguments concerning his failure to call Scantlebury and Dorsey. First, referring to Scantlebury, the prosecutor stated:

> [T]here is no testimony before you that he ever identified anybody; that he ever was going to say anything different. His testimony was worthless (876).

Then, addressing defense counsel's arguments concerning Dorsey, the prosecutor stated:

> I did not call Diane Dorsey, ... it's true. I had her signed up with the cooperation agreement. If I wanted her to testify, she was going to testify. If I had her testifying they would have said, Miss Dorsey, you'll say whatever the D.A. wants you to say, because you signed a cooperation agreement with them (877).

Later in his summation, the prosecution attempted to rehabilitate Chatram's credibility. Trying to turn a weakness of his case into a virtue, the prosecutor argued:

> If Ricky wanted to lie to you or try to do anything else to get you to think he was really trying to help me out, don't you think he would have sat up here and looked around and said, all right, judge, court reporter, jury, lawyer, lawyer, defendant, it's a process of elimination. He would have pointed his finger at this guy. He didn't. He didn't remember (901).

The prosecutor then noted that Chatram had, in fact, identified petitioner at the lineup, three years before the trial.

The prosecutor then addressed Dutt's testimony, noting that she was among the people who picked petitioner out of a lineup (902). Petitioner argued that Dutt was particularly likely to remember the person who had pointed the gun at her belly, saying:

> Mona is the one person who had a real true reason to remember. She was six months pregnant. He was pointing a gun. Who was pointing a gun at her unborn child? Him (902).

29

Near the end of his summation, the prosecutor argued that the reliability of the witnesses' lineup identifications was supported by the fact that they also identified Milton. The prosecutor first noted the evidence connecting Milton to the crime, including the fingerprint lifted from Dorsey's car. The prosecutor then stated:

> [A]ll the evidence says they're right about Glen Milton. My argument to you is if they're right about Glen Milton, another thing to tell you they're right when they say this defendant ... was the other guy. Those people were able to pick out Milton. They were able to pick out this defendant. And they're right. They are the kind of people we can rely on as jurors. They can make reliable identifications (908).

### *The Charge and Verdict*

Following the summations, Justice Rosengarten charged the jury. As neither party had requested a "missing witness" charge, no such charge was given. Justice Rosengarten also did not give a "co mingling" charge, but stated, "In arriving at your verdict use all of [the] evidence that was placed before you" (925).

The trial court charged the jury two counts of both robbery in the first degree and robbery in the second degrees: one count of each offense relating to the May 2 robbery and the second count of each offense relating to the May 16 incident. The court also charged petitioner with one count of robbery in the first degree in connection with the March 15, 1997, robbery.

The jury ultimately acquitted petitioner of the fifth count, but convicted him of the other four counts (970-71). On July 13, 2000, Justice Rosengarten adjudicated petitioner a persistent violent felony offender and sentenced him to a combination of concurrent and consecutive terms totaling 35 years to life imprisonment.

### The Post-Judgment Proceedings

On direct appeal, petitioner's counsel filed a 37-page brief, raising four points. First, appellate counsel argued that the trial court had deprived petitioner of his due process right to a fair trial by erroneously granting the prosecution's *Batson* challenge. Second, counsel argued that petitioner's equal protection rights had been violated by the prosecutor's discriminatory use of a peremptory challenge against Ms. Williams. Third, counsel argued that petitioner had been deprived of his constitutional right to the effective assistance of trial counsel. The fourth argument related to sentencing.

In August 2003, the Appellate Division affirmed petitioner's conviction, reaching all four issues on the merits and rejecting each of them. *People v. Alston*, 307 A.D.2d 1046 (N.Y. App. Div. 2003). Petitioner then sought leave to appeal to the New York Court of Appeals, but his application was denied on November 10, 2003. *People v. Alston*, 1 N.Y.3d 539 (2003).

On January 24, 2005, petitioner commenced this action by filing a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. That petition raised the four issues set forth on direct appeal, but also raised a fifth issue, alleging ineffective assistance of appellate counsel. After receiving this Court's order to show cause why a writ of habeas corpus should not be granted, respondent moved to dismiss the petition, arguing that this ineffective assistance claim was unexhausted and that the petition was, therefore, "mixed." *See Rose v. Lundy*, 455 U.S. 509, 519-21 (1982). Petitioner responded to this motion by filing a cross-motion to stay the petition until this ineffective assistance claim could be exhausted pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005).

While these motions were pending, petitioner applied for a writ of error coram nobis in the Appellate Division, Second Department. By order dated November 14, 2005, the Appellate

Division denied that application, holding that petitioner had "failed to establish that he was denied the effective assistance of appellate counsel." *People v. Alston*, 23 A.D.3d 488, 488-89 (N.Y. App. Div. 2005). Thereafter, respondent withdrew his motion to dismiss and this Court granted petitioner's motion to amend his petition pursuant to Fed. R. Civ. P. 15(a).

In May 2006, petitioner – now represented by counsel – filed his amended petition. That petition raised four issues: the first three of the four issues raised on direct appeal, plus petitioner's ineffective assistance of appellate counsel claim. Although the reverse *Batson* and *Batson* claims were essentially identical to the claims raised before the Appellate Division, the ineffective assistance of trial counsel claim differed from the one that had been raised on direct appeal. Specifically, one of the errors attributed to trial counsel in the amended petition was his failure to request a "co-mingling" charge. That argument had not been advanced before the Appellate Division or in a motion pursuant to New York Criminal Procedure Law § 440.10.

In his response to the amended petition, respondent addressed all four of petitioner's grounds on the merits. However, respondent also argued that the amended petition was unexhausted by virtue of the new "co-mingling" claim which petitioner including in arguing that his trial counsel had rendered ineffective assistance of trial counsel.

## *DISCUSSION*

### *I. Federal Habeas Corpus Standard of Review*

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

32

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). An "adjudication on the merits" is a substantive, rather than a procedural, resolution of a federal claim. *See Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (citations omitted). A state court has adjudicated a state petitioner's claim on the merits when it "(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Bell v. Miller*, 500 F.3d 149,155 (2d Cir. 2007) (quoting *Sellan*, 261 F.3d 303 at 312).

Under § 2254(d)(1) – the "contrary to" clause – a federal habeas court may grant the writ "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that reached by the Supreme Court. *Bell v. Cone*, 543 U.S. 447, 452-53 (2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). Under § 2254(d)(2) – the "unreasonable application" clause – a federal habeas court may grant the writ if the state court "'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of the petitioner's case." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)). "[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton*, 295 F.3d 270, 278 (2d Cir. 2002).

## II. The *Batson* and Reverse *Batson* Challenges

Petitioner's first and second grounds for habeas corpus relief both relate to so-called *Batson* challenges to the exercise of peremptory challenges to prospective petit jurors. *Batson* challenges are named after *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court case

which established that "[t]he Equal Protection Clause guarantees ... [a criminal] defendant that the State will not exclude members of his race from the jury venire on account of race." *Id.* at 86.

Batson itself protected only members of a "cognizable racial group" in cases in which a prosecutor "exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* at 96. However, five years later, the Supreme Court "lessened the import of *Batson*'s 'cognizable racial group' language ... by holding that a criminal defendant has third-party standing to raise the equal protection claims of venirepersons who have been peremptorily excluded from a petit jury on account of purposeful racial discrimination, even if the defendant and the peremptorily excluded venirepersons were not of the same race." *Green v. Travis*, 414 F.3d 288, 297 (2d Cir. 2005) (citing *Powers v. Ohio*, 499 U.S. 400, 415-16 (1991)). *Powers* recognized the right of individual jurors "not be excluded from jury service on account of ... race," 499 U.S. at 407, and "established that the racially discriminatory peremptory challenge of one juror, standing alone, violates the Equal Protection Clause." *Green*, 414 F.3d at 297 (citing *Powers*, 499 U.S. at 409). Although the equal protection rights being vindicated under *Powers* were those of the prospective jurors, the *Powers* Court found that a criminal defendant had third-party standing because, *inter alia*, he or she "suffered cognizable injury because racial discrimination in the selection of jurors casts doubt on the integrity of the judicial process ... and ... the fairness of a criminal proceeding ...." *Georgia v. McCollum*, 505 U.S. 42, 55-56 (1992) (internal quotations omitted; elipses added) (citing *Powers*, 499 U.S. at 411).

In *Georgia v. McCollum*, the Supreme Court used the reasoning in *Powers* to hold that the Equal Protection Clause also prohibits criminal defendants from engaging in intentional racial discrimination in exercising peremptory challenges. The Supreme Court reasoned that the

damage to the individual juror's equal protection rights and to the integrity of the judicial process was the same regardless of whether the prosecution or defense was engaging in the discrimination. *Id.* at 48-50. Although the Court recognized that "[r]acial discrimination ... violates the Constitution only when it is attributable to state action," *id.* at 50 (citing *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172 (1972)), it held that "[i]n exercising a peremptory challenge, a criminal defendant is wielding the power to choose a quintessential governmental body" and is, therefore, "bound by the constitutional mandate of race neutrality." *Id.* at 54. The Court further held that prosecutors have third-party standing to raise equal protection claims for the same reasons articulated in *Powers.* Id. at 55-56. *McCollum* thereby authorized what has come to be known as "reverse *Batson*" challenges: prosecution motions to strike a criminal defendant's allegedly discriminatory exercise of peremptory challenges.

### The Procedure for Evaluating *Batson* Claims

In *Batson,* the Supreme Court established a three-step process for evaluating claims that a prosecutor used peremptory challenges in racial discriminatory manner. *See Batson*, 476 U.S., at 96-98. First, the defendant must make a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race. *Id.*, at 96-97. If the defendant makes that showing, the burden shifts to the prosecutor to articulate a race-neutral explanation for exercising the peremptory challenge in question. *Id.*, at 97-98. In the third step, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination. *Id.*, at 98. The procedure to be followed in adjudicating a reverse *Batson* challenge is essentially the same as that prescribed in *Batson, see McKinney v. Artuz*, 326 U.S. 87, 97 n. 12 (2d Cir. 2003), except that the prosecution must make the prima facie showing in step one and "if the State demonstrates a prima facie case of racial discrimination by the defendant[], the defendant[] must

articulate a racially neutral explanation for the peremptory challenges." *McCollum*, 505 U.S. at 59.

Under the circumstances of this case, there is no reason to discuss the first step of the *Batson* analysis in more detail. Once the nonmoving party "has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the [moving party] ... made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion). In this case, the trial court asked both the prosecutor and defense counsel to provide race-neutral explanations for the peremptory challenge that was the subject of the adversary's *Batson* motion, then ruled on the credibility of those explanations. Accordingly, there is no reason to discuss whether the defense or prosecution made a prima facie showing of discrimination. Rather, this Court will proceed to examine the second and third steps.

To satisfy its burden under the second step, the nonmoving party must offer a race-neutral reason for exercising the peremptory challenge which is the subject of the *Batson* motion. However, "[t]he nonmoving party's burden at step two is very low." *McKinney*, 326 F.3d at 98. "The second step ... does not demand an explanation that is persuasive, or even plausible. *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995)(per curiam). As the Supreme Court explained in *Hernandez*:

> At this step of the inquiry, the issue is the facial validity of the ... explanation. Unless a discriminatory intent is inherent in the ... explanation, the reason offered will be deemed race neutral.

500 U.S. at 360 (plurality opinion).

The persuasiveness of this explanation does not become relevant until step three, in which the trial court must determine whether the moving party has carried the burden proving

36

purposeful discrimination. *See Purkett*, 514 U.S. at 768. The "step three" determination "largely ... turn[s] on evaluation of credibility." *Batson*, 476 U.S., at 98, n. 21. As the *Hernandez* Court explained:

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.

*Hernandez*, 500 U.S. at 365.

Because "[t]he credibility of [the] attorney offering a race-neutral explanation is at the very heart of [the step three] analysis," *Barnes v. Anderson*, 202 F.3d 150, 157 (2d Cir. 1999), a trial court cannot "deny a *Batson* motion without explicitly adjudicating the credibility of the non-moving ... party's race neutral explanations for its actions in peremptorily striking potential jurors." *Jordan v. Lefevre*, 206 F.3d 196, 200 (2d Cir. 2000). However, "a trial judge is not obligated to provide 'a talismanic recitation of specific words in order to satisfy *Batson*.'" *Messiah v. Duncan*, 435 F.3d 186, 199 n. 6 (2d Cir. 2006) (quoting *Galarza v. Keane*, 252 F.3d 630, 640 n. 10 (2d Cir. 2001)). "[A] trial court can fulfill its duty to rule at ... 'step three' of the *Batson* framework by expressing a clear intention to uphold or reject a strike after listening to the challenge, the race-neutral explanation and the arguments of the parties. *Id.* at 189.

Since "evaluation of [an attorney's] state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province,'" *Hernandez*, 500 U.S. at 365 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)), a trial court's evaluation of counsel's race-neutral explanation is "ordinarily entitled to great deference." *Jordan v. Lefevre*, 206 F.3d 196, 200 (2d Cir. 2000). Even on direct appeal, "the credibility findings a trial court makes in a *Batson* inquiry are reviewed for clear error." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (citing *Hernandez*, 500 U.S.

at 364-366).   However, as noted in Section I, *ante*, 28 U.S.C. § 2254 provides that "[a]n

application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment

of a State court shall not be granted with respect to any claim that was adjudicated on the merits

in the State court proceedings unless the adjudication of the claim ... resulted in a decision that

was based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding." 28 U.S.C. § 2254(d)(2).   Accordingly, in evaluating the trial court's

determination in step three, this Court could grant petitioner's application for a writ of habeas

corpus only if it were to find that the trial court acted unreasonably in crediting or discrediting the

race-neutral explanations offered by the nonmoving party. *See Rice*, 546 U.S. at 338 .

Moreover, under 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State

Court [is] presumed to be correct," unless that presumption is rebutted by "clear and convincing

evidence." *See Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

### B. *The Reverse Batson Motion*

Applying this deferential standard to the trial court's ruling on the prosecution's reverse

*Batson* motion, this Court cannot find that the trial court acted unreasonably in discrediting

defense counsel's explanation for challenging Charlotte Berge.   When asked if he had "a reason

other than race for [his] peremptory challenge of [Ms.] Berge," defense counsel stated, "Her

statements that, I guess so. I would try" (357).   Defense also referred to Ms. Berge's "limited

education" (357).

Defense counsel's characterizations of Ms. Berge's statements during voir dire are not

substantiated by the record.   To the contrary, when questioned by Justice Rosengarten, Ms. Berge

stated that she "basically" understood the legal principals he had discussed earlier in voir dire and

could follow and accept them (316).   Although she "had an ex-son-in-law [who] was a police

38

officer for 20 years" (316), Ms. Berge replied, "Not really," when asked if this fact would make her view the testimony of police officers more favorably (316). Ms. Berge expressed no doubt about her ability to be fair and impartial. Asked if she could "be fair and impartial and give both sides a fair trial" if selected to serve as a juror, Ms. Berge responded, "Of course" (317).

There was support in the record for defense counsel's observation that Ms. Berge had a "limited education." When asked by Justice Rosengarten how far she went in school, Ms. Berge replied, "Just junior high" (314). However, defense counsel had already proved entirely willing to seat jurors who had only slightly more education than Ms. Berge. In the first round of jury selection, for example, defense counsel elected not to challenge Richard Mays, a disabled veteran with a high school education. Defense counsel also stated that he "would love" to have been able to seat Mary Lassitter, a retired postal worker with a high school education, but agreed with the prosecutor and trial counsel that she lived too close to the crime scene and might recognize one of the witness (105). During the second round, defense counsel agreed to seat a female juror, alternatively referred to as Julie Myint (109) and Ms. Mien (154), despite the fact that she, too, had only a high school education (154-55). Finally during the third round, defense counsel did not challenge Charlie Jones, a retired janitor who had quit school during or after eleventh grade (246-47).

Defense counsel's claim that he had struck Berge because of her limited education was not only belied by his prior willingness to seat relatively uneducated jurors, but also by the simplicity of the case itself. This case did not involve complicated facts or crimes that only a sophisticated juror could understand. Rather, the crimes at issue were gunpoint robberies – garden-variety crimes of a highly unsophisticated nature. In light of these facts, this Court cannot

find that it was unreasonable for the trial court to find that defense counsel's purported race-neutral reasons for striking Berge were pretexts for racial discrimination.

Petitioner's arguments do not persuade this Court to the contrary. First, the prosecution did not, as petitioner implies, have any obligation to come "forward with ... evidence during step three that would support an inference that [defense] counsel's reasons were pretextual." Petitioner's Memo at 22. As discussed above at pp. 37, *ante*, the three-step procedure prescribed by *Batson* does not necessarily require the movant to rebut the race-neutral reasons provided at step two. Rather, in the third step, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson,* 476 U.S. at 98.

Second, petitioner is incorrect in implying that *Purkett v. Elem*, 514 U.S. 765 (1995), forbids a trial court from summarily rejecting an allegedly race-neutral reason for striking a juror. *Purkett* involved a *Batson* challenge where the prosecutor's proffered reason for exercising peremptory challenges to two African-American jurors related to the length of their hair and the fact that they had facial hair. The trial court accepted this reason without explanation and rejected the *Batson* challenge. That decision was affirmed by the Missouri Court of Appeals, which held that the prosecutor's explanation "constituted a legitimate 'hunch' " and that "[t]he circumstances fail[ed] to raise the necessary inference of racial discrimination." *State v. Elem*, 747 S.W.2d 772, 775 (Mo.App.1988).

Elem then sought a writ of habeas corpus in federal court, but the district court denied his § 2254 application, concluding that the Missouri courts' determination that there had been no purposeful discrimination had support in the record and was entitled to a presumption of correctness under § 2254(d). The Eighth Circuit reversed the district court and remanded the

case with instructions to grant the writ of habeas corpus. *Elem v. Purkett*, 25 F.3d 679 (8th Cir. 1994). The Eighth Circuit reasoned that the second step of the *Batson* analysis required the prosecutor to "articulate some plausible race-neutral reason" that would "somehow affect the person's ability to perform his or her duties as a juror." *Id.* at 683.

The Supreme Court then reversed the Eighth Circuit, holding that "[t]he Court of Appeals erred by combining *Batson*'s second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive ...." *Purkett*, 514 U.S. at 768. Noting that "the Court of Appeals did not conclude or even attempt to conclude that the state court's finding of no racial motive was not fairly supported by the record," the Supreme Court remanded the case to the Eighth Circuit for further proceedings. Id. at 769-70. However, nothing in *Purkett* even implies that a trial court cannot summarily accept or reject a proffered race-neutral explanation. Indeed, this Court notes that, upon remand, the Eighth Circuit denied Elem's application for a writ of habeas corpus. *Elem v. Purkett*, 64 F.3d 1195 (8th Cir. 1995).

Since this Court concludes that the trial court's decision to discredit defense counsel's race-neutral explanations for his peremptory challenge of Berge was fairly supported by the record and entirely reasonable, the trial court's actions in empaneling Ms. Berge did not violate Petitioner's rights under "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In light of this decision, this Court need not reach respondent's argument that the denial of a defendant's peremptory challenges cannot be the basis for habeas relief. *See McKinney*, 326 F.3d at 98.

## C. *The __Batson__ Motion*

This Court also cannot find that the trial court acted unreasonably in crediting the prosecutor's race-neutral explanation for exercising a peremptory challenging against Nyla Williams. When asked to articulate his reason for striking Ms. Williams, the prosecutor stated, in pertinent part:

> She, for the first half on Thursday, was basically asleep in her chair. She wouldn't look at me after I spoke to her some more. And she had – it was basically her demeanor when she was speaking to me (362).

The trial court then sustained the prosecutor's peremptory challenge to Williams, saying, "I find she was somewhat evasive" (362).

"[W]here the explanation for a peremptory challenge is based on a prospective juror's demeanor, the judge should take into account, among other things, any observations of the juror that the judge was able to make during the *voir dire*." *Thaler v. Haynes*, 130 S.Ct. 1171, 1174 (2010). In this case, the record suggests that Justice Rosengarten relied, at least in part, on his own observations of Williams' demeanor in crediting the prosecutor's explanation. This sort of demeanor-based evaluation of the state of mind of a juror "lies 'peculiarly within a trial judge's province.'" *Hernandez*, 500 U.S. at 365 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)). This Court does not find any basis in the record for concluding that the trial judge's determination, based on the judge's own observation of Williams, was unreasonable.

Petitioner's attempts to argue that the recorded portion of the voir dire provide no factual support for the trial judge's determination is unavailing. First, only the "first half" of the fourth round of voir dire – in which Justice Rosengarten posed the same litany of questions to each of

14 prospective jurors, including Williams – was recorded. The "second half," in which defense counsel and the prosecutor had the opportunity to question Ms. Williams themselves, was not recorded (350-51). The prosecutor's principle race-neutral explanation for striking Ms. Williams – namely, that she "wouldn't look at *me* after *I* spoke to her some more" and that he did not like "her demeanor when she was speaking to me" (350) (emphasis added) – related to the unrecorded second half of the voir dire. Evidence that Williams was not evasive during the recorded, first half of the voir dire, therefore, does not undermine the prosecution's principle race-neutral reason for striking Ms. Williams.

Second, even had the entire voir dire been recorded, the prosecutor's race-neutral reasons related solely to Williams' demeanor, rather than to her statements. Written transcripts can only record the substance of the venirepersons' answers, not the prospective jurors' inflection, body language or attitude. The transcript of the first half, for example, was entirely silent on the question of whether Williams was "basically asleep," as the prosecution asserted. Accordingly, even a careful parsing of Ms. Williams' answers to Justice Rosengarten's questions sheds no light whatsoever on the credibility of the prosecution's race-neutral reasons.

This Court is also unpersuaded by petitioner's attempt to analogize this case to *Jordan v. LeFevre*, 206 F.3d 196 (2d Cir, 2000), and *United States v. Thomas*, 320 F.3d 315 (2d Cir. 2003). In *Jordan*, the trial judge did not even afford the defendant the opportunity to offer an argument to support a prima facie showing of discrimination. Rather, the judge stated:

> [I]n order to save us an awful lot of time, while I don't think it's necessary or required at the present time, I would ask [the prosecutor] to give me, if you have it, a non-racial basis for exercising the challenges.

43

206 F.3d at 199. After the prosecutor provided race neutral reasons for three strikes, the judge ruled:

> [T]o the extent there is any application on the *Batson*, I'm denying it. It seems to me there is some rational basis for the exercise of the challenge.

*Id.*

The Second Circuit held that the trial court had "made no effort to comply with the letter, much less the spirit, of *Batson*," but merely "engaged in a perfunctory exercise designed to speed the proceedings along." *Id.* at 201. The Second Circuit found that the trial court had not made a "meaningful inquiry into the question of discrimination," and "did not make the required determination at the third *Batson* step." *Id.* at 201-02. In this case, in contrast, the trial judge complied with both the letter and spirit of *Batson*, permitting each party an opportunity to be heard and making the required credibility determination.

This case is also distinguishable from *Thomas*. In that case, the Second Circuit held, in the context of a direct appeal, that it was error to deny a *Batson* motion without determining whether the prosecution's race-neutral explanations for the challenged peremptory strikes were credible. *Thomas*, 320 F.3d at 320. In *Thomas*, however, the Second Circuit itself noted that one way for the trial court to make that credibility determination was "for the court to confirm the accuracy of the prosecutor's explanation (e.g., that the juror was impatient or evasive)." *Id.* That is essentially what the trial court did in this case.

## III. Ineffective Assistance of Trial Counsel

In his remaining grounds for habeas relief, petitioner argues that he was denied his Sixth Amendment right to effective assistance of counsel by both his trial lawyer and his appellate

counsel. *Williams*, 529 U.S. at 412-13. The Sixth Amendment of the United States Constitution ensures that "in all criminal prosecutions, the accused shall ... have the Assistance of Counsel" for his defense. U.S. Const. Amend. VI. Although the Sixth Amendment does not expressly require that counsel be "effective," courts have found that the right to counsel inherently implies the right to effective assistance. As the Second Circuit has noted, the very "purpose of the Sixth Amendment guarantee of 'the Assistance of Counsel' ... is to ensure that defendants have effective assistance of counsel." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (internal quotations and citations omitted).

Federal law relating to effective assistance of counsel was clearly established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). That case established a two-pronged test for deciding ineffective assistance claims. To satisfy the first prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Specifically, "[a] convicted defendant ... must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690.

To satisfy the second prong, a defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Supreme Court defines "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* Further, "[t]he level of prejudice the defendant need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'" *Linstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 693).

"[A] petitioner cannot prevail on a claim of ineffective assistance merely because he disagrees with his counsel's strategy." *Singleton v. Duncan*, No. 03-CV-561, 2006 WL 73734, at

45

*14 (E.D.N.Y. Jan. 10, 2006) (citing *Jones v. Barnes*, 463 U.S. 745, 752 (1983)). Indeed, "determinations regarding the defense strategy adopted at trial" are "[a]mong the 'virtually unchallengeable' tactical decisions left to the judgment of trial counsel." *Gluzman v. United States*, 124 F. Supp. 2d 171, 174 (S.D.N.Y. 2000) (citing *United States v. Simmons*, 923 F.2d 934, 956 (2d Cir.1991)). Therefore, when applying the two-pronged test, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Courts assessing whether counsel was ineffective "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* The burden is on the defendant to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955) (internal quotations omitted)).

"[R]elief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy." *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998). However, ultimately, "[t]he relevant inquiry focuses 'on the fundamental fairness of the proceeding whose results are being challenged.'" *Bien v. Smith*, 546 F. Supp. 2d 26, 51 (E.D.N.Y. 2008) (quoting *Strickland*, 466 U.S. at 696). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

In this case, petitioner identified a dozen errors which trial counsel allegedly committed during his representation of petitioner. These errors are grouped into five categories: 1) the failure to object to the introduction of hearsay and opinion evidence; 2) the decision to ask

46

questions that elicited evidence of petitioner's criminal history; 3) the failure to impeach Chatram about details he omitted to tell the police and to call a police witness to prove those omissions; 4) the failure to object to certain portions of the prosecutor's summation; and 5) the failure to request a "missing witness" charge and a "co-mingling" charge. This Court will address the specific errors included in each of these categories seriatim.

### A. The Failure to Object to the Introduction of Hearsay and Opinion Evidence

In the first of the five categories, petitioner identifies three instances in which defense counsel allegedly failed to object to portions of Warner's testimony. First, petitioner faults defense counsel for failing to object to introduction of the recording of Dorsey's 911 call on the ground that it was "rank hearsay." Petitioner's Memorandum of Law in Support of Petition for a Writ of Habeas Corpus ("Petitioner's Memo") at 33. Second, petitioner argues that defense counsel should have objected when the prosecutor adduced Warner's opinions regarding Dorsey's carjacking tale. *Id.* at 34. Third, petitioner claims that defense counsel should have objected to testimony which implied that Milton had implicated petitioner.

The first of these alleged errors – the failure to object to Dorsey's 911 call on hearsay grounds – was simply not error. Hearsay is typically defined as "a statement made out of court … offered for the truth of the fact asserted in the statement." Richardson on Evidence, § 200 (10th ed. 1973). Accordingly, a 911 call is not hearsay if it is not offered for the truth of the matter asserted therein. *See, e.g., People v. Wynn*, 55 A.D.3d 1378, 1379, 864 N.Y.S.2d 641, 642 (N.Y. App. Div. 2008).

The prosecution in this case did not introduce Dorsey's 911 call to prove the truth of the matter asserted therein. Rather, the People maintained that Dorsey's statements were completely

47

untrue – fabricated to exculpate Dorsey after Pharmacy employees saw the perpetrators entering her car. Therefore, the 911 call was not "rank hearsay," and any objection on that ground would have been overruled. Moreover, this Court notes that defense counsel unsuccessfully objected to introduction of the 911 call on two other, more viable bases both prior to the start of testimony (402) and during Warner's testimony (418).

The second error which petitioner has identified – namely, defense counsel's failure to object when the prosecutor adduced Warner's opinions regarding Dorsey's carjacking tale – was an obvious strategic decision. In his opening statement, defense counsel argued forcefully that Dorsey was "a liar" (409). Shortly thereafter, Warner testified that Dorsey's carjacking story "didn't make a lot of sense" (430) and that he "didn't like it" (429). Even assuming that Warner's testimony was, as petitioner asserts, inadmissible "opinion evidence" (Petitioner's Memo at 34), this testimony substantiated defense counsel's argument about Dorsey's veracity. Therefore, defense counsel decision not to object was clearly strategic.

The third error identified by petitioner relates to defense counsel's failure to object to a line of questioning which, petitioner asserts, implied that Milton had implicated petitioner as a robber. Specifically, petitioner argues defense counsel should have objected to Warner's testimony that, after speaking with Milton, he returned to Dorsey's residence to arrest petitioner. Relying on cases such as *People v. Tufano*, 69 A.D.2d 826 (N.Y. App. Div. 1979), and *Mason v. Scully*, 16 F.3d 38 (2d Cir. 1994), petitioner argues that Warner's testimony was not only hearsay, but violated petitioner's right to confront Milton.[4]

---

[4]Petitioner also relies on a third case, which he cites as *People v. Jones*, 198 A.D.2d 249 (N.Y. App. Div. 2003). Because petitioner's citation is incorrect, this Court is unable to evaluate whether this case, like *Tufano* and *Mason*, is distinguishable.

The cases on which petitioner relies, however, are distinguishable. In *Tufano*, the Assistant District Attorney "attempted to show ... that it was [a co-defendant's] statement that led [the police] to arrest Tufano." *Tufano*, 69 A.D.2d at 827. After the defendant's counsel objected to this line of questioning, the trial court limited this line of questioning but permitted an officer to testify that "he had had a 'conversation' with [the co-defendant] and that defendant was arrested shortly thereafter." *Id.* On appeal, the Appellate Division held that it was error to permit this testimony, stating, "[w]hile the precise contents of the conversation were not revealed on direct examination, it was clearly the Assistant District Attorney's intention to create, in the jurors' minds, the impression that [the co-defendant] had implicated Tufano." *Id.*

Similarly, in *Mason*, the prosecution made an obvious attempt to imply that a non-testifying co-defendant had identified Mason during a conversation with police. After a police officer testified that he had held a conversation with the co-defendant after that co-defendant was identified in a lineup, the prosecutor asked:

> Q:    [A]fter this conversation with [the co-defendant], were you looking for somebody?
>
> A:    Yes, I was.
>
> Q:    And, who were you looking for?
>
> A:    Terrence Mason.

16 F.3d at 40.

Upon habeas review, the Second Circuit, relying primarily on *Tufano*, held that the admission of this hearsay testimony violated Mason's right to confront his co-defendant at trial. The Second Circuit stated:

> The testimony ... violated the rules against hearsay and violated
> Mason's right of confrontation. The fact that the content of [the co-
> defendant's] statement to [the police] was not revealed in detail
> was immaterial, for the plain implication that the prosecutor sought
> to elicit, and emphasized in his summation, was that the
> conversation with [the co-defendant] led the police to focus on
> Mason.

*Id.* at 43.

In this case, unlike in *Tufano* and *Mason*, it is unclear from the testimony whether the prosecution sought to imply that Milton implicated petitioner in his conversation with the police. After adducing testimony that Warner had questioned Milton and had gone somewhere thereafter (434), the prosecutor asked approximately 15 questions before he established that the police had gone to arrest petitioner (437). Moreover, in the course of that questioning, the prosecutor established that the conversation with Milton took place sometime between 8:00 and 10:30 p.m. (434-35), but that petitioner was not arrested until sometime after midnight (436). Although an attentive juror might still have deduced that Milton implicated petitioner, the manner in which the prosecutor in this case questioned Warner did not make that implication as obvious as it was in *Mason*. In addition, the prosecutor in this case, unlike the prosecutors in *Tufano* and *Mason*, made no effort to use this implication on summation.

Moreover, while Mason's petition for a writ of habeas corpus was, in fact, granted, it was granted primarily on the ground that petitioner's right to confrontation had been violated. In this case, petitioner makes no such argument. Rather, petitioner argues only that defense counsel erred in failing to object to this testimony. The decision not to object, however, was not only defensible, but strategically wise. As noted above, the implication that Milton inculpated petitioner was not self-evident. Objecting to Warner's testimony that he arrested petitioner could

only have served to highlight the implication for the jury. Therefore, this Court cannot find that defense counsel erred in failing to object to this portion of Warner's testimony.

**B. Trial Counsel's Decision to Elicit Evidence regarding Petitioner's Criminal History**

The second category of errors identified by petitioner relate to two instances in which defense counsel adduced evidence that the police had arrested petitioner prior to May 17, 1997. First, petitioner faults defense counsel for asking Kearns – the police sergeant who arrested petitioner in the abandoned house – whether he had ever seen petitioner before, prompting Kearns to state that his "anti-crime unit" had arrested petitioner "a few years" earlier (557). Petitioner argues that there was "no apparent reason" to ask that question, and asserts that "[t]here was no strategic reason for counsel to elicit that testimony." Petitioner's Memo at 39. Second, petitioner argues that defense counsel "exhibited a woeful lack of preparation" when he questioned Warner about whether he had ever arrested a "Jeffrey Milton." *Id.* at 38.

These arguments suggest that petitioner misapprehends defense counsel's theory at trial. Defense counsel's theory was that the police identified petitioner as a result of information provided by his co-defendants – principally, the inveterate "liar," Diana Dorsey. Although Dorsey was patently incredible, having repeatedly lied to Warner, the police nonetheless believed her statements about petitioner because they, themselves, were aware of his criminal history. Relying primarily on Dorsey's statements, they arrested petitioner and placed him in a lineup where he was mistakenly identified by the eyewitnesses.

Viewed in the context of this strategy, the rationale underlying defense counsel's allegedly erroneous questions is quite apparent. First, defense counsel wanted to establish through Kearns' testimony that the police had a reason to be biased against petitioner and,

therefore, to believe Dorsey's accusations against him. Accordingly, defense counsel needed Kearns, who had already testified that he had previously met petitioner and knew what he looked like, to elaborate on their prior interaction. To that end, defense counsel not only established Kearns' unit had previously arrested petitioner, but also 1) that Kearns "didn't consider himself safe" in searching the abandoned building because he knew petitioner "was still in the building" (563) and 2) that Kearns, who saw no need to frisk the disheveled Hispanic men he encountered in the building, immediately frisked petitioner (560).

Since defense counsel's strategy required him to adduce evidence of petitioner's prior contacts with the law, defense counsel may have seen little downside risk in attempting to confuse the jury by questioning Warner about "Jeffrey Milton." However, this Court has no doubt that defense counsel's decision to ask about Jeffrey Milton was deliberate and not, as petitioner asserts, due to "a woeful lack of preparation." Petitioner's Memo at 38. Defense counsel was well aware of petitioner's use of this alias, as evidenced by his attempts, at the *Sandoval* hearing, to preclude the prosecutor from cross examining petitioner about his use of that name. Moreover, defense counsel comments that "the name Milton would match someone else whose name will come up in the testimony of this trial as having been arrested and having played a particular role" and that evidence of this alias would be prejudicial indicated that petitioner was well aware of the risk of introducing this testimony. Even though this strategy backfired, enabling the prosecutor to use petitioner's use of this alias to argue that petitioner knew Milton, it is difficult to argue that the decision was not strategic. As respondent correctly points out, this sort of deliberate decision to elicit otherwise inadmissible information "is the kind of tactical decision that courts in the Second Circuit are reluctant to second-guess."

Respondent's Memorandum of Law in Opposition to Petition ("Respondent's Memo") at 74

(quoting *Jeremiah v. Artuz*, 181 F. Supp. 2d 194, 205 (E.D.N.Y. 2002)).

## C. The Failure to Impeach Chatram with Omissions

The next alleged error identified by petitioner relates to defense counsel's failure to use "important impeachment material" to impeach Chatram's credibility. Petitioner's Memo at 39. Petitioner asserts that defense counsel was in possession of a police report memorializing Chatram's initial description of the May 2, 1997, robbery. Although that report is not in the record, petitioner claims that this report made no mention of the fact that Chatram saw the shorter perpetrator remove the stocking from his face, and that defense counsel did not fully exploit this omission. Specifically, petitioner argues that, after "Chatram testified he could not recall whether he mentioned this detail," defense counsel should have called the policeman who authored the report to prove that Chatram had, in fact, failed to mention it.

To explain why this argument lacks merit, this Court must first discuss the New York law relating to impeachment by omission. The relevant law has been succinctly summarized by the New York Court of Appeals as follows:

> It is well established that a witness' prior inconsistent statements may be used to impeach his trial testimony. And the test of inconsistency, we have said, is not limited to outright contradictions between a witness' prior statements and his trial testimony; it includes, as well, omitting to mention critical facts at the prior time, which facts are later related at trial. The weight of authority holds, however, that a witness may not be impeached simply by showing that he omitted to state a fact, or to state it more fully at a prior time. It need also be shown that at the prior time the witness' attention was called to the matter and that he was specifically asked about the facts embraced in the question propounded at trial.

*People v. Bornholdt*, 33 N.Y.2d 75, 88 (1973) (internal citations omitted).

53

There are exceptions to this general rule. As the *Bornholdt* Court explained, "The rule ... accords with human experience recognizing that unless asked directly about a matter a person may quite normally omit it from a narrative description." *Id.* at 89. However, "when given circumstances make it most unnatural to omit certain information from a statement, the fact of the omission is ... admissible for purposes of impeachment." *People v. Savage*, 50 N.Y.2d 673, 679 (1980).

In *Savage* – the case on which petitioner principally relies – the defendant confessed to a shooting, but failed to tell the police that the victim was attempting to rob him. When the defendant advanced a justification defense at trial, the trial court permitted the prosecution to adduce evidence concerning this omission. In upholding the trial court's ruling on direct appeal, the New York Court of Appeals held:

> [T]hat the defendant decided not to offer the mitigating explanation for his conduct in amelioration of his role in the shooting he undertook to describe could challenge credulity. Having on his own ventured to communicate devastatingly incriminating information, his failure to then so much as mention the excuse he was later to put forth is well-nigh inexplicable except as a recent fabrication. Measured by the way in which almost any normal person would perceive it, the strongest considerations of self-interest would be expected to keep him from containing it within himself. In short, his conduct ran counter to human experience.

*Savage*, 50 N.Y.2d at 679.

Petitioner's attempt to compare Chatram's failure to relate all the details of the May 2, 1997, robbery to Savage's failure to mention his justification for the shooting is unavailing. Indeed, Petitioner's Memo itself characterizes the fact that the shorter perpetrator removed the stocking as a "detail." Petitioner's Memo at 39. Although this may have been an important detail, it was not essential to Chatram's account of the crime or his description of the perpetrator,

but was the very sort of detail that one might "quite normally omit ... from a narrative description." *See Bornholdt*, 33 N.Y.2d at 89.

The trial court apparently concurred with this assessment. When defense counsel asked Chatram, "Did you ever, when talking about the May 2nd robbery, tell any of the police investigating the case that the shorter man took the mask off?", the trial court initially overruled the prosecutor's objection (711). However, when the prosecutor protested that defense counsel was "[i]mpeaching from the negative," the court reversed itself and sustained the objection (711). Thereafter, the court struck Chatram's prior testimony regarding whether he had ever told the police that the shorter perpetrator had a mustache. In light of these rulings, the trial court clearly would not have permitted defense counsel to call a police witness to establish what Chatram may have omitted from his statement to the police. Therefore, defense counsel's decision not to attempt to introduce extrinsic evidence to prove the substance of Chatram prior inconsistent statement was not error.

### D. *Defense Counsel's Failure to Object to Alleged Summation Error*

In the fourth category of errors, petitioner faults defense counsel for failing to object to certain summation comments made by the prosecutor. Specifically, petitioner argues that defense counsel should have objected when the prosecutor 1) stated that Scantlebury had nothing to add; 2) told the jury that he decided not to call Dorsey because she was a cooperating witness and would have been impeached; 3) appealed to the jurors' emotions by arguing that petitioner pointed a gun at Dutt's "unborn child"; 4) opined that Chatram would have made an in-court identification if he "was really trying to help me out"; and 5) argued that the witnesses' identifications of Milton strengthened the reliability of their identifications of petitioner. Petitioner's Memo at 41-42.

Defense counsel could not, however, have objected to the first three of these alleged summation errors because they were responsive to his own arguments. As discussed in Section E below, defense counsel did not request a missing witness charge. Nonetheless, he argued to the jury that the prosecutor could and should have called Scantlebury and Dorsey, implying that they were not called because their testimony would have damaged the People's case. The prosecutor, who had no advance notice that defense counsel would make this argument and no opportunity to adduce evidence concerning his reasons for not calling these witnesses, was simply responding to this tactic by explaining why he failed to call these witnesses. Similarly, the prosecutor's comments concerning Dutt's "unborn child" were responsive to that portion of defense counsel's summation in which he acknowledged that pointing a gun at Dutt's belly was a "disgusting" act, but one which the petitioner did not commit. The prosecutor simply echoed that theme, arguing to the jury that the person who committed this act was, in fact, petitioner.

While the remaining two comments might not have been responsive, the decision not to object was strategic. The prosecutor's summation was very lengthy, and objecting to these particular comments could only have served to highlight them in the jurors minds. Moreover, even assuming, *arguendo*, that these comments were objectionable, none of the comments were particularly egregious. Accordingly, even if defense counsel erred in failing to object to them, there is not "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

### E.  The Failure to Request a "Missing Witness" Charge and a "Co-mingling" Charge

The fifth and final category of errors relates to defense counsel's failure to request two jury instructions. First, petitioner argues that defense counsel should have requested a "missing

witness" charge with regard to the prosecution's failure to call Scantlebury and Dorsey. Second, petitioner argues that defense counsel should have requested a so-called "co-mingling" charge, directing the jury to consider each incident separately and to return a verdict solely on the evidence applicable to each incident. Petitioner's Memo at 43.

A "missing witness" charge is appropriate where a party can establish that the adversary "had the ability to locate and produce the witness and 'there was such a relationship, in legal status or on the facts, as to make it natural to expect the party to have called the witness to testify in his favor.'" *People v. Keen*, 94 N.Y.2d 533, 539 (2000) (quoting *People v Gonzalez*, 68 N.Y.2d 424, 429 (1986)). In order to request the charge, the proponent bears the burden of showing that "there is an uncalled witness believed to be knowledgeable about a material issue pending in the case, that such witness can be expected to testify favorably to the opposing party and that such party has failed to call him to testify." *Keen*, 94 N.Y.2d at 539; *Gonzalez*, 68 N.Y.2d at 427). The burden then shifts to the opposing party who, "[i]n order to defeat the request for a missing witness charge, ... must demonstrate that the witness is not knowledgeable about the issue, that the issue is not material or relevant, that the testimony from the missing witness would be merely cumulative to other evidence, that the witness is not available or that the witness is not under the party's control such that the witness would be *expected* to testify in the party's favor." *Keen*, 94 N.Y.2d at 539 (emphasis in original).

In this case, defense counsel might have requested a "missing witness" charge. There was evidence in the record suggesting that Scantlebury and Dorsey were "knowledgeable" about the incidents at issue in the case, and those witnesses could be "expected to testify favorably" to the prosecution. *See Keen*, 94 N.Y.2d at 539. However, there is no evidence to establish that

57

petitioner's request with respect to Scantlebury would have been successful. Indeed, the prosecutor's summation – in which he represented that Scantlebury had no non-cumulative, material evidence to offer – suggests that the prosecutor would have been able to defeat petitioner's request for a missing witness charge with respect to that witness.

However, even assuming that defense counsel could have obtained a missing witness charge with respect to both witnesses, petitioner has not demonstrated that there is "a reasonable probability that ... the result of the proceeding would have been different" had counsel requested these charges. *Strickland*, 466 U.S. at 694. Despite having failed to request the charge, defense counsel argued forcefully that both Scantlebury and Dorsey could have been called by the prosecution and urged the jury to draw some unspecified negative inference from the fact that the prosecutor failed to call them. However, this argument failed to persuade the jury to acquit petitioner of either of the May robberies.

Petitioner's argument that defense counsel failed to request a "co-mingling" charge has not been exhausted. Under 28 U.S.C. § 2254(b)(1), "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that ... (A) the applicant has exhausted the remedies available in the courts of the State ...." 28 U.S.C. § 2254(b)(1). This means that "[b]efore seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, ... thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotations and citation omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting

that court to the federal nature of the claim." *Id.* (citing *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (per curiam) and *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). Accordingly, before this Court can "reach the merits of [an ineffective representation claim], all of [the] allegations must have been presented to the state courts, allowing them the opportunity to consider *all* the circumstances and cumulative effect of the claims as a whole." *Caballero v. Keane*, 42 F.3d 738, 740 (2d Cir. 1994) (brackets and emphasis in original).

In this case, it is beyond dispute that the failure to request a "co-mingling" charge was not mentioned on direct appeal. Indeed, petitioner filed a petition for a writ of error corim nobis in state court, arguing that his appellate counsel was ineffective for failing to advance this claim. Moreover, this argument, which is "an important premise" of petitioner's ineffective assistance claim, does not merely supplement the claim presented to the state courts, but fundamentally alters it. *Caballero*, 42 F.3d at 741.

As discussed in this section and Section IV below, this Court finds that petitioner's trial and appellate counsel were not ineffective. Accordingly, this Court finds neither cause nor prejudice with respect to the failure to exhaust the "co-mingling" argument. However, rather than dismiss this entire case as a mixed petition, see *Caballero*, 42 F.3d at 740 (citing *Rose v. Lundy*, 455 U.S. 509, 522 (1982)), this Court will deem the unexhausted "co-mingling" charge argument to have been withdrawn.

## IV.  *Ineffective Assistance of Appellate Counsel*

In addition to arguing that trial counsel was ineffective, petitioner argues that his appellate counsel was ineffective because he failed to argue that the trial court's failure to give a "co-mingling" charge denied petitioner a fair trial. In addressing ineffective assistance of

appellate counsel, courts utilize the same *Strickland* two-pronged test that is used in cases alleging ineffective assistance of trial counsel. *See Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992). A petitioner may establish ineffective assistance by demonstrating that counsel failed to raise significant and obvious issues and instead chose to set forth significantly weaker arguments. *See Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000). However, "it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." *Id.* (citing *Jones*, 463 U.S. at 754). Accordingly, when reviewing the performance of appellate counsel, courts should refrain from "second-guess[ing] reasonable professional judgments and impos[ing] on ... counsel a duty to raise every colorable claim on appeal." *Jackson*, 162 F.3d at 85 (internal quotations and citation omitted).

In this case, petitioner's appellate counsel filed a well-written and well-researched, 37-page brief, raising four issues on direct appeal. Those were substantial issues, the first three of which serve as the basis for this habeas petition. The co-mingling claim, in contrast, was unpreserved. Although appellate counsel could have raised that issue and asked the Appellate Division to consider it in the interest of justice, this Court declines to "second-guess" capable counsel's judgment and to fault him for not raising "every colorable claim on appeal." *See Jackson*, 162 F.3d at 85. Accordingly, this Court finds that appellate counsel's failure to raise the "co-mingling" charge argument did not render his assistance ineffective.

## *CONCLUSION*

For the reasons set forth above, the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied and this case is dismissed. Since petitioner has not made a substantial showing of the denial of a constitutional right, no certificate of appealability is granted with respect to any of petitioner's claims. *See* 28 U.S.C. § 2253(c)(2).

SO ORDERED.

s/ SLT
SANDRA L. TOWNES
United States District Judge

Dated: March 31, 2010
Brooklyn, New York